**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jorge MANOTAS–MEJIA, Justo Estrada-Tello, Julian Enriquez-Castro, and Samuel Ramirez-Rios, Defendants-Appellants.**

**No. 86–2667.**

United States Court of Appeals,
Fifth Circuit.

Aug. 4, 1987.

Rehearing and Rehearing En Banc
Denied Oct. 1, 1987.

Michael G. Martinez, Houston, Tex. (court-appointed), for Estrado-Tello.

Ralph R. Martinez, Houston, Tex. (court-appointed), for Enriquez-Castro.

Kent Robinson, Andrews & Kurth, Houston, Tex., for Samuel Ramirez-Rios.

Stephen J. Finta, Ft. Lauderdale, Fla., for Manotas-Mejia.

James R. Gough, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before RANDALL, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

The defendants appeal their convictions for distributing and importing cocaine and for conspiracy. Upon review of the record we affirm the convictions.

## I. *The Stake Out*

Jorge Manotas-Mejia, Justo Estrada-Tello, Julian Enriquez-Castro, and Samuel Ramirez-Rios were crew members on the Colombian ship CATALINA. Manotas was the ship's second engineer, in charge of certain engine room equipment. On March 22, 1986, the CATALINA arrived at the port of Houston, Texas from Barranquilla, Colombia. A confidential informant had alerted the United States Customs Service that the CATALINA carried about fifteen kilograms of cocaine for delivery to one "Carlos Vaca" in Houston. Based on this tip, Customs agents staked out the port and placed the CATALINA under surveillance once it arrived.

At about 8:00 p.m. on March 22, agent Robert Mangle saw Marilou Buyoc and a man board the CATALINA carrying a television set box. The man disembarked almost immediately. Buyoc disembarked at about 8:30 p.m. carrying a Gucci style handbag. She left the port in a car. Mangle followed her a short distance and then stopped her and placed her under arrest. In her car, Mangle found the Gucci bag stuffed with about five kilograms of cocaine.

During "debriefing" after her arrest, Buyoc agreed to help the authorities catch her suppliers on the CATALINA. At 11:30 p.m., she returned to the ship with undercover agent Lorenzo Mesa posing as her husband and a cocaine buyer. Once on board, Mesa negotiated to buy three kilograms of cocaine for $72,000 and actually left the boat with four kilograms. The next day, March 23, 1983, Mesa returned to the CATALINA and arrested the four appellants.

## II. *The Indictment*

A four count indictment charged the appellants and Buyoc with various narcotics

offenses involving cocaine. Count I charged that the four appellants and Buyoc conspired to possess over 1,000 grams with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Count II charged all five defendants with possession with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Count III charged the four appellants (but not Buyoc) with distribution of the cocaine, in violation of 21 U.S.C. § 841(a)(1), and Count IV charged the appellants with importation, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1).

Counts III and IV also charged violation of 18 U.S.C. § 2, which provides that one "who aids, abets, counsels, commands, induces, or procures [the] commission [of a crime] is punishable as a principal."

After their arrest on March 23, the appellants were held without bail until trial. Buyoc, who also was arrested, was released on bail and fled the jurisdiction. Still a fugitive, she has not been tried.

### III. *The Trial*

Without Buyoc, the government's key witness at trial was agent Mesa, who explained his 11:30 p.m. purchase in detail. According to Mesa, he and Buyoc boarded the CATALINA and went to Estrada's cabin, where they met Estrada and Manotas. The cabin was small, about six feet by ten feet. Manotas asked if Buyoc had been arrested earlier after she left with the handbag, and Buyoc and Mesa assured him that she had encountered no trouble. Mesa told Manotas and Estrada that he had found a buyer for the rest of their cocaine. Manotas and Estrada urged Mesa to speak quickly and quietly: Estrada warned that informants were on board, and Manotas told Mesa to use the slang term "aparatos" instead of "cocaine." Manotas also bragged that he would bring twenty kilograms on his next trip.

At Manotas' direction, Estrada called for Ramirez. Manotas told Ramirez that Mesa had found a buyer, and Ramirez and Mesa negotiated a price of $24,000 per kilogram for three kilograms. Ramirez demanded immediate payment, but Manotas assured him that Buyoc could be trusted to bring

the money the next day. Ramirez left to get the cocaine, which Manotas and Estrada told Mesa was in the engine room.

Ramirez, accompanied by Enriquez, returned with a large bag that he handed to Mesa. Mesa emptied the contents, seven small packages, which Ramirez identified as three kilograms of cocaine. Enriquez told Mesa to pay in large bills, which would be easier to hide then a large number of small bills. Manotas told Buyoc to hide the bundles of cocaine in her clothes, but Mesa packed them in a box and left. Mesa returned the next day to arrest Manotas, Ramirez, Enriquez, and Estrada.

Aside from a chemist to identify the cocaine, the government's only other witness was agent Robert Mangle, the Customs officer who had surveyed the CATALINA and arrested Buyoc on March 22. According to his testimony, he surveyed the CATALINA from the time it docked in Houston and saw Buyoc board the ship at about 8:00 p.m. without the Gucci bag and leave at about 8:30 with it.

Of the defendants, only Estrada did not testify. Ramirez and Enriquez testified that they worked until 10:00 or 11:00 p.m. on March 22, ate dinner together in Ramirez's cabin, watched television, and retired for the night. They and Manotas denied selling cocaine on the 22nd and claimed that they first met Mesa when he arrested them on the 23rd. Ramirez also. testified that he physically resembled another crew member, also named Ramirez, with whom Mesa must have confused him. Manotas also called a character witness to vouch for his law abiding reputation.

The jury convicted Manotas and Ramirez on all four counts and Estrada and Enriquez on Counts I, II, and III, but the district court vacated the convictions of all four appellants on Count II. The court sentenced both Manotas and Ramirez to twenty years on Counts I, III, and IV, to run concurrently, and sentenced both Estrada and Enriquez to fourteen years on Counts I and III, to run concurrently.

On appeal, each defendant challenges the sufficiency of the evidence to support his

convictions. In addition, Manotas claims that (1) a variance between Count I and the evidence at trial mandates reversal of his convictions, (2) his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment, and (3) he must be resentenced because of errors at his sentencing hearing. Finally, Ramirez claims that his identification by Mesa was improper.

## IV. *Standard of Review*

We review the evidence in the light most favorable to the government and affirm if substantial evidence supports the verdict, that is, if a reasonable jury could have found guilt beyond a reasonable doubt. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *United States v. Loalza-Vasquez,* 735 F.2d 153, 158 (5th Cir.1984). Contrary to defendants' contentions, to support a conviction the evidence need not exclude "every reasonable hypothesis of innocence." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983); *United States v. Livingston,* 816 F.2d 184, 192 (5th Cir.1987). "We must reverse if a reasonable jury must have had a reasonable doubt about guilt." *United States v. Moreno-Hinojosa,* 804 F.2d 845, 847 (5th Cir.1986).

## V. *Count I.*

### a. *Sufficiency of the Evidence*

■ All four appellants claim that there is insufficient evidence to uphold their convictions for Count I, conspiracy. A conspiracy is an agreement between two or more people to commit a crime. *United States v. Ortiz-Loya,* 777 F.2d 973, 981 (5th Cir.1985). The government must prove that each conspirator knew the "essential nature" of the conspiracy and intentionally joined it. *United States v. Fowler,* 735 F.2d 823, 826 (5th Cir.1984); *see also United States v. Colwell,* 764 F.2d 1070, 1072 (5th Cir.1985) (defendant must intentionally and voluntarily join the conspiracy); *Ortiz-Loya,* 777 F.2d at 981 (defendant must intend to violate the substantive offense);

*United States v. Gordon,* 712 F.2d 110, 114 (5th Cir.1983) (defendant must have "deliberate, knowing, and specific intent to join the conspiracy"). The government may prove an agreement by circumstantial evidence, although "close association" with criminals or "mere presence" at the scene of the crime will not support a conviction for conspiracy. *Fowler,* 735 F.2d at 827; *United States v. Magee,* 821 F.2d 234 (5th Cir.1987); *United States v. Holcomb,* 797 F.2d 1320, 1327 (5th Cir.1986).

■ It is clear that the jury decided to believe Mesa and disbelieve the appellants. Mesa's testimony clearly linked all four appellants to a conspiracy. Ramirez carried the cocaine to Estrada's cabin, negotiated a price, and demanded immediate payment. Enriquez accompanied Ramirez with the cocaine and told Mesa to bring large bills. The transaction occurred in Estrada's small cabin, and Estrada warned Mesa to speak quietly because informants might be listening. Manotas made many statements that manifest his involvement: he bragged that he would bring twenty kilograms on his next trip; he asked Buyoc if she had trouble after the 8:30 delivery; he suggested the term "apparatos;" he vouched for Buyoc's reliability and persuaded Ramirez to delay payment. The evidence clearly supports the convictions on Count I.

### b. *Variance*

Manotas also attacks his conviction for conspiracy on grounds of variance between the charge in Count I and the proof at trial. As far as we can tell from his brief, Manotas makes three mutually exclusive arguments: (1) Count I charged a conspiracy among the appellants and Buyoc to possess cocaine *at 8:30 p.m.,* before Buyoc's arrest, but the government did not prove such a conspiracy; (2) Count I charged a conspiracy among the appellants and Buyoc to possess cocaine *at 11:30 p.m.,* while Buyoc was cooperating with the government, but the government proved at most a conspiracy among only the appellants at 11:30; and (3) the indictment charged one conspir-

acy, but the government proved two—one at 8:30 and another at 11:30.

We reject these claims, and, for the reasons set out below, we find that the government proved the conspiracy that had been charged in the indictment.

■ An indictment is sufficient if it "first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *see United States v. Bailey*, 444 U.S. 394, 414, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980); *United States v. Stratton*, 649 F.2d 1066, 1073 (5th Cir.1981). The indictment and proof must coincide to protect the accused from (1) surprise and (2) the risk of another prosecution for the same crime. *See Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

■ First, we explain that the indictment informed the appellants of the charge against them and guarded against surprise. Count I charged that the appellants and Buyoc conspired "on or about March 22," without specifying the hour or any overt acts. As we interpret this phrase by its plain meaning, there was only *one* conspiracy with a single object, to possess cocaine "on or about March 22." *See United States v. Winship*, 724 F.2d 1116, 1122 (5th Cir.1984) ("crucial factor in finding a single conspiracy [is] whether the alleged coconspirators all took part in a common plan or scheme").

■ We acknowledge that a government agent cannot be a co-conspirator and that there can be no conspiracy between one defendant and a government informer. *See United States v. Martino*, 648 F.2d 367, 405 (5th Cir.1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474

(1982). Thus, Buyoc could not be a conspirator while cooperating with the government, although she could be part of a continuing conspiracy until she turned informer. Manotas makes too much of this point. A conspiracy may exist among three or more people "even [if] the link connecting many of the ... co-conspirators is a Government informer." *Id.; United States v. Enstam*, 622 F.2d 857, 867 (5th Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 and 451 U.S. 907, 101 S.Ct. 1974, 68 L.Ed.2d 294 (1981). All four appellants conspired in the Mesa transaction; the fact that Buyoc is named in the indictment hardly caused surprise to the appellants at trial. As set out above, the government clearly proved that overt acts manifesting conspiracy among the appellants occurred at 11:30 p.m. It was not necessary for the government to show what the appellants were doing earlier in the day.[1] The events of the 11:30 meeting, however, show that all four of the appellants were aware at that time that there was a substantial amount of cocaine on board, and they were acting together in making the deal with Mesa with respect to cocaine on board.

The district court instructed the jury that a conspiracy is "an agreement between two or more people to join together for an unlawful purpose" but did not instruct that Buyoc could not be a conspirator while cooperating with the government after her arrest. This omission *theoretically* created the risk that the jury could convict one of the appellants for conspiring only with Buyoc during the Mesa transaction. The trial testimony shows, however, that Buyoc sat almost mute while Mesa negotiated, so the jury must have convicted each appellant of conspiring with *another appellant* and not only with Buyoc. Thus, upon the record the jury convicted the defendants of the charged offense.[2]

---

1. The evidence makes it clear that *Manotas*, the only appellant to complain about a variance, knew about the cocaine Buyoc possessed earlier in the evening. When Buyoc showed up at 11:30, he asked her if she had been arrested

after she had left the ship, and he persuaded Ramirez to trust Buyoc.

2. In *United States v. Ylda*, 653 F.2d 912 (5th Cir.1981), the indictment charged that the defendant received money as a bribe, but the district court instructed the jury to convict if the

Clearly, the mere fact that the jury did not—or could not—convict all named co-conspirators is no cause for reversal. As the Supreme Court stated in *Berger:* "Although an indictment charges a conspiracy involving several persons and the proof establishes the conspiracy against some of them only, the variance is not material." 295 U.S. at 81, 55 S.Ct. at 630; *see also United States v. Kaiser,* 660 F.2d 724, 730 (9th Cir.1981) (not fatal that government did not connect all defendants to conspiracy), *cert. denied,* 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 and 457 U.S. 1121, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982), *rev'd on other grounds, United States v. DeBright,* 730 F.2d 1255 (9th Cir.1984) (en banc).

■ Moreover, the fact that Buyoc, a named co-conspirator, may have withdrawn from the conspiracy after her arrest did not end one conspiracy and begin another. Co-conspirators may come and go, and each change in membership does not create a new conspiracy. *See United States v. Leach,* 613 F.2d 1295, 1299 (5th Cir.1980) (agreement to burn several houses constituted one conspiracy, even though new arsonists joined and old ones dropped out along the way); *United States v. Bates,* 600 F.2d 505, 509 (5th Cir.1979) (a single conspiracy is not split into many simply because of changes in personnel).

As set out above, we find that the indictment charged and the government proved *one* conspiracy. Even if the government had proved two conspiracies, however, the variance might have been "harmless." *Berger,* 295 U.S. at 81, 55 S.Ct. at 630; *see Martino,* 648 F.2d at 382. "The true in-

quiry ... is not whether there has been a variance ... but whether there has been such a variance as to 'affect the substantial rights' of the accused." *Berger,* 295 U.S. at 81, 55 S.Ct. at 630. The indictment clearly gave the appellants notice of the charge against them. They did not object at trial to the nature of Mesa's testimony, and the government's proof did not surprise or unfairly prejudice them.[3]

■ Next, we must address whether the appellants face "the risk of another prosecution for the same crime." *Berger,* 295 U.S. at 82, 55 S.Ct. at 630. The government may not split one conspiracy into two prosecutions, and any subsequent prosecution of the appellants would be judged by the five factors identified in *United States v. Marable,* 578 F.2d 151, 154 (5th Cir.1978): (1) time, (2) persons acting as conspirators, (3) the statutory offense charged in the indictment, (4) the location where the conspiracy took place, and (5) the overt acts charged by the government or any other description of the charged offense that indicates the scope and nature of the activities that the government sought to punish in each case. *See also United States v. Dunn,* 775 F.2d 604 (5th Cir.1985). If the appellants are again indicted and make a "nonfrivolous" claim of double jeopardy, then the government will have to show that the subsequent indictment charges a different offense than the indictment in the case before us. *United States v. Nichols,* 741 F.2d 767, 771 (5th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985). We hold

---

defendant *agreed to* or did receive money *or anything of value.* Thus, the jury theoretically could have convicted Ylda of a crime not charged in the indictment. We affirmed the conviction, however, because the evidence clearly showed that Ylda actually received money, so the jury must have convicted for the charged offense in spite of the jury instructions. The case before us is similar to *Ylda.*

**3.** *Cf. Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In *Kotteakos,* the indictment charged one conspiracy to obtain loans fraudulently but the government proved *eight* conspiracies involving over thirty people led by Simon Brown, a central figure common to all eight conspiracies. Each conspiracy, how-

ever, was independent of the others, and only Brown knew or had reason to know that other conspiracies existed. The Supreme Court held that this variance prejudiced the defendants because the jury might have transferred the guilt of one defendant to a defendant in another, independent conspiracy. *Kotteakos* recognized, however, that reversal is not always required when the government proves many conspiracies although one is charged. *Id.* at 756, 66 S.Ct. at 1243 (*citing Berger*). In the case before us, the appellants suffered no prejudice similar to that in *Kotteakos.* All four appellants were present together when the cocaine sale was made. Each participated with each other of the four.

that the indictment and our interpretation of it adequately protect the appellants from the risk of another prosecution for the same conspiracy.

## VI. *Counts III and IV: Sufficiency of the Evidence*

■ As set out above, Counts III and IV charged not only substantive offenses but also violation of 18 U.S.C. § 2. To prove aiding and abetting, the government must prove that the defendant "associated with a criminal venture, participated in the venture, and sought by his action to make the venture succeed." *Holcomb*, 797 F.2d at 1328. The defendant must share the principal's criminal intent and engage in some affirmative conduct designed to aid the venture. *Colwell*, 764 F.2d at 1072; *see United States v. Baresh*, 790 F.2d 392, 399 (5th Cir.1986); *Ortiz-Loya*, 777 F.2d at 980.

■ The evidence supports the convictions for Count III, distribution of cocaine or aiding and abetting. In addition to the evidence summarized above, Manotas and Estrada sent for Ramirez, and Ramirez and Enriquez brought the cocaine to Estrada's cabin.

■ The evidence also supports Manotas' and Ramirez' convictions for Count IV, importation. To prove importation, the government may prove by circumstantial evidence that the defendant brought cocaine to the United States from outside the country; the government need not show that the defendant was seen carrying the drugs across the border. *See United States v. Miranda*, 593 F.2d 590, 597 (5th Cir.1979); *United States v. Phillips*, 664 F.2d 971, 1033 (5th Cir.1981), *cert. denied, Meinster v. United States* and *Myers v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982) and *Platshorn v. United States*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). There was testimony that the CATALINA came to Houston from Barranquilla. As set out above, Manotas boasted that he would bring twenty kilograms on his next trip.

He sent for Ramirez, who brought the four kilograms for Mesa. Manotas worked in the engine room where he said the cocaine was kept. The jury could find beyond a reasonable doubt that Manotas and Ramirez brought the cocaine from Colombia. Sufficient evidence supports the convictions on Count IV.

## VII. *Manotas' Sentence*

### a. *Cruel and Unusual Punishment*

Manotas claims that his twenty year sentence is disproportionate to his crime and violates the Eighth Amendment's bar against "cruel and unusual punishments." *See Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). The proportionality analysis set out in *Solem* is guided by "objective critera, including (i) the gravity of the offensive and harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Id.* at 292, 103 S.Ct. at 3011. Manotas focuses his attack on the first criterion listed above and argues: "Common sense dictates that a person convicted of five or six kilograms of cocaine should not be [sentenced to twenty years]."

■ We acknowledge that Manotas received the maximum prison terms allowed by Congress under Counts I, III, and IV,[4] but this alone does not make his punishment "cruel and unusual." Drug use is a serious problem in our society, and Manotas imported and distributed a large quantity of cocaine. The four kilograms delivered to Mesa had a "wholesale" value of at least $72,000 and, according to trial testimony, a "street" value after "cutting" of up to $640,000. Moreover, Manotas' three sentences run *concurrently*. They could have been consecutive. His sentences are not "cruel and unusual."

### b. *The Sentencing Hearing*

After Manotas was convicted but before he was sentenced, a probation officer con-

---

**4.** Since Manotas was sentenced, Congress increased the maximum imprisonment for each of his crimes to *forty* years. *See* 21 U.S.C. § 841(b)(1)(B) (distributing 500 grams or more); 21 U.S.C. § 960(b)(2) (importing 500 grams or more).

ducted a "presentence investigation" ("PSI") and reported his findings to the district court, as provided in Fed.R.Crim.P. 32. The PSI included the defendant's prior record, personal and family data, and sentencing information.

In addition, the United States Attorney filed a "Sentencing Memorandum" with the district court on July 31, 1986, two weeks before sentencing. In it, the government stated that if Buyoc had appeared at trial, she would have testified that (1) she received fifteen kilograms of cocaine from Manotas on March 21, the day before the Mesa transaction, and (2) she received the five kilograms at 8:00 p.m. on March 22 from crew members on the CATALINA.

During his allocution at the sentencing hearing, Manotas told the district court:

I'm not in agreement with the proof presented by the government attorney in the respect that one day before the ship arrived in the United States that some drugs were taken off the ship consisting of fifteen kilos of said substance.

The district court sentenced Manotas without addressing his objection to the alleged March 21 transaction.

▪ In sentencing, the district court may consider factors not introduced into evidence at trial. *See United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). Due process requires, however, that the defendant be sentenced on reliable information. *Id.;*[5] *see United States v. Fulbright*, 804 F.2d 847, 853 (5th Cir.1986) (district court may consider only facts that have some "minimal indicium of reliability"); *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir.1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982). As an added protection to ensure fair sentencing procedures, Fed.R.Crim.P. 32(c)(3)(D) provides:

If the ... defendant ... allege[s] any factual inaccuracy in the presentence investigation report ..., the court shall, as

to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

▪ Rule 32(c)(3)(D) serves two functions. First, it protects the defendant from being sentenced on inaccurate information. Second, it creates an accurate record of the factors on which the district court relied at sentencing. Such a record is important, because prison or parole officials may consider information in a PSI when making correctional or parole decisions. *See United States v. Velasquez*, 748 F.2d 972, 974 (5th Cir.1984); *United States v. Lawal*, 810 F.2d 491, 494 (5th Cir.1987) (PSI stated that defendant obtained $100,000 in a mail fraud scheme while defendant claimed he obtained only $1,200); *United States v. Petitto*, 767 F.2d 607, 611 (9th Cir.1985). A failure of the district court to comply with Rule 32(c)(3)(D) may be raised for the first time on appeal and requires resentencing. *Velasquez*, 748 F.2d at 973; *Petitto*, 767 F.2d at 611; *United States v. O'Neill*, 767 F.2d 780, 787 (11th Cir.1985). Thus, if the *PSI* had contained the contested information about a March 21 delivery, we clearly would have to remand for the district court to resentence Manotas. Rule 32(c)(3)(D), however, applies only to the probation department's PSI. The issue before us now is whether to order resentencing although the disputed information appeared in the government's Sentencing Memorandum rather than the PSI.

The fact that the information contested by Manotas appeared in the Sentencing Memorandum rather than the PSI in no way diminishes the dangers against which Rule 32(c)(3)(D) guards. In imposing sentence, the district court may have considered the government's unsubstantiated but prejudicial allegation that Manotas de-

---

**5.** Tucker was sentenced for bank robbery in 1953, and the sentencing judge knew that he had three prior convictions. After sentencing, two of Tucker's three prior convictions were invalidated by *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), which was applied retroactively, *Pickelsimer v. Wainwright*, 375 U.S. 2, 84 S.Ct. 80, 11 L.Ed.2d 41 (1963). The Supreme Court ordered resentencing for Tucker's 1953 conviction and forbade the sentencing judge to consider the two convictions obtained in violation of *Gideon*.

livered fifteen kilograms on March 21. Moreover, the Sentencing Memorandum the government filed in district court is part of the public record, available to the Bureau of Prisons, parole commissions, or other agencies that will decide place of incarceration, parole possibilities, and other issues affecting Manotas.[6]

█ The district court at sentencing is best situated to inquire into the contested Sentencing Memorandum, and its inquiry may aid a parole or prison agency that might consider the Sentencing Memorandum at some future time. The district court did not state whether it relied on the Sentencing Memorandum. Thus, the court did rely or may have relied on the Memorandum, although no reliable evidence supported the allegation of a March 21 transaction. In light of the risks presented by the Sentencing Memorandum in this case, we remand for a new sentencing hearing to enable the district court to address Manotas' objection to the Sentencing Memorandum as it would address a challenge to information in the PSI. It should (1) make a finding regarding the allegation that Manotas delivered cocaine on March 21 or (2) explain that it will not or did not consider the challenged information in imposing sentence.

### VIII. *Ramirez' Identification*

█ Ramirez claims on appeal that Mesa's March 23 and in-court identifications violated due process and tainted his convictions. An identification procedure violates due process if it is "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). Six factors affect whether Mesa's identification was impermissibly suggestive and unreliable: (1) Mesa's opportunity to view Ramirez at the time of the alleged crime; (2) Mesa's degree of attention during the alleged crime; (3) the accuracy of Mesa's identification;

(4) Mesa's level of certainty at the time of the identification; (5) the time elapsed between the alleged crime and the identification; and (6) the corrupting influence of the suggestive identification. *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *United States v. Watkins,* 741 F.2d 692, 695 (5th Cir. 1984); *United States v. Atkins,* 698 F.2d 711, 713 (5th Cir.1983).

█ On March 22, Mesa viewed Ramirez in close quarters for four or five minutes in normal light. Mesa, like the witness in *Manson,* was a trained officer: he knew he would have to identify the conspirators, and he was attentive to detail, even under pressure. He identified and arrested Ramirez within twenty-four hours of the crime. At trial about three months later Mesa again identified Ramirez, gave a detailed account of the March 22 transaction, and testified that he had "no doubt whatsoever" about Ramirez' identity. He also explained that, during the March 23 arrest, he simply picked Ramirez and the other defendants out of a crowd on the boat; he did not use a one-on-one show-up or a planned line-up.

Given all these circumstances, Mesa's identification was neither overly suggestive nor likely to result in misidentification.

### IX. *Conclusion*

The evidence is sufficient to support the convictions, and no fatal variance existed between the indictment and the proof at trial. Manotas' sentence is not "cruel and unusual," but he is entitled to a new sentencing hearing. Finally, Mesa's identification of Ramirez was proper.

The convictions are affirmed, and we order a new sentencing hearing for defendant Manotas only.

AFFIRMED.

6. For instances, in making parole decisions a parole commission may consider presentence reports, reports from prosecutors, and any other "relevant information" about the prisoner. *See* 28 C.F.R. § 2.19; 18 U.S.C. § 4207; *Page v. United States Parole Commission,* 651 F.2d 1083, 1086 (5th Cir.1981); *Nunez-Guardado v. Hadden,* 722 F.2d 618, 622 (10th Cir.1983) (parole commission may consider "Border Patrol Report").

REMANDED FOR RESENTENCING OF APPELLANT MANOTAS.