**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, <br><br> v. <br><br> DAVID PHILLIPS, AKA David John Phillips, *Defendant-Appellant.* | No. 18-50138 <br><br> D.C. No. 2:17-cr-00498-FMO-1 <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Fernando M. Olguin, District Judge, Presiding

Argued and Submitted June 10, 2019
Pasadena, California

Filed July 11, 2019

Before: Kim McLane Wardlaw, Jay S. Bybee,
and John B. Owens, Circuit Judges.

Opinion by Judge Owens

### SUMMARY[*]

#### Criminal Law

In a case in which the defendant was convicted of conspiracy to use interstate telephone calls in the commission of a murder-for-hire in violation of 18 U.S.C. § 1958, the panel affirmed the district court's conclusion that the defendant's promise to forgive an uncollectible and legally unenforceable debt satisfies the pecuniary value requirement of § 1958.

The panel explained that the pecuniary value requirement does not require the murder-for-hire agreement to comport with contract rules; the defendant's promise to relieve the hit man of a debt for an illegal marijuana venture gave the hit man an economic benefit, satisfying the pecuniary value requirement for murder-for-hire.

In a concurrently filed memorandum, the panel concluded that the district court erred in excluding all evidence relating to the defendant's kidney disease, but that the error was harmless.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Glen T. Jonas (argued), Jonas & Driscoll LLP, Torrance, California, for Defendant-Appellant.

Kevin G. Boitmann (argued), Chief of Appeals; Peter G. Strasser, United States Attorney; United States Attorney's Office, New Orleans, Louisiana; for Plaintiff-Appellee.

## OPINION

OWENS, Circuit Judge:

David Phillips appeals from his jury conviction for conspiracy to use interstate telephone calls in the commission of a murder-for-hire in violation of 18 U.S.C. § 1958. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the district court's conclusion that Phillips' promise to forgive an uncollectable debt satisfies the pecuniary value requirement of § 1958.[1]

## I.  BACKGROUND

Phillips owned NKP Medical, a digital marketing agency focused on promoting plastic surgeons, cosmetic dentists, and similar "aesthetic" medical procedures. He hired Steven Fruchter as a contractor to serve, in effect, as NKP's Chief Technology Officer. Phillips and Fruchter initially hit it off,

---

[1] In a concurrently filed memorandum disposition, we conclude that the district court erred in excluding all evidence relating to Phillips' kidney disease, but that the error was harmless.

and they discussed making Fruchter an equal partner in NKP.

But things went south when their negotiations over the potential partnership and rights to a software application got heated. Fruchter left NKP and created Growth Med, a direct competitor of NKP. The two started accusing each other of poaching clients, exchanging some aggressive texts along the way. In one text, Phillips told Fruchter, "Don't push me, man, really not worth it."

Phillips frequently blew off steam at a local bar, where he befriended David Suiaunoa, the bouncer. Phillips agreed to loan $30,000 to Suiaunoa to start a marijuana grow house operation. But Suiaunoa, who had an extensive criminal history, was a better bouncer than businessman. He squandered the first $10,000 on personal expenses and the remaining funds in a scheme to distribute methamphetamine, but law enforcement intercepted his drug shipment.

According to Suiaunoa (who pled guilty and cooperated with the government), when he informed Phillips that he could not repay the $30,000, Phillips offered to forgive the loan if Suiaunoa murdered someone. Phillips explained that this person was antagonizing him and hitting on his wife, so the person should be "taken care of." When Suiaunoa asked if Phillips wanted the person beat up, Phillips clarified that he wanted him "taken out." Suiaunoa replied, "I know some guys that probably could take care of that."

Suiaunoa then called a friend from his prison days to discuss the deal. Suiaunoa explained that he had a "hit" job from a businessman who wanted someone bothering him to be "taken care of," and "if I could do, you know, and I wouldn't have to"—meaning that Suiaunoa would not have

to repay the $30,000 loan. The friend said he knew someone who could handle the job. But the friend did not tell Suiaunoa that he was working as a confidential informant as part of a narcotics investigation and was recording the call. In a series of follow-up discussions, the informant and an undercover officer told Suiaunoa that they had a contact in Mexico who could carry out the murder.

Suiaunoa met with Phillips at the NKP office to convey the "good news" and get information about the target. Phillips gave him a piece of paper with Fruchter's photo and home and work addresses, and they discussed that Phillips should cover himself by gathering receipts to show he was elsewhere at the time of the murder.

After Suiaunoa shared the paper with the undercover officer, agents identified the target as Fruchter and informed him that Phillips had contracted someone to murder him. Fruchter understandably panicked and told the agents about his soured relationship with Phillips. The agents helped Fruchter stage his death, including creating photos of Fruchter on the ground, beaten and shot in the head.

Around this time, agents arrested Suiaunoa for distribution of methamphetamine and interviewed him about the murder-for-hire. They seized his cell phone, which continued to receive incoming text messages and a call from Phillips. Suiaunoa agreed to cooperate and, under the agents' instructions, called Phillips to say that he "finally connected with the right people" and would "handle that issue this weekend." Phillips did not question what Suiaunoa was referring to and agreed to meet him outside the NKP office the following week.

During the meeting outside the NKP office, which was audio and video recorded, Suiaunoa told Phillips, "We got

that done for you," and handed him a staged photograph of Fruchter's dead body. After a brief discussion in which Suiaunoa described killing Fruchter in vivid detail, Phillips returned to his office. Agents arrested him shortly thereafter when he exited the building. In Phillips' office, agents found the staged photo of Fruchter shredded in a trash can. The agents also found paper and electronic evidence showing that Phillips had gathered information about Fruchter, including the photo that he had provided to Suiaunoa.

Phillips was indicted with Suiaunoa for conspiring to use interstate telephone calls to carry out the murder-for-hire of Fruchter in violation of 18 U.S.C. § 1958. Relevant to this appeal, Phillips argued that forgiving Suiaunoa's $30,000 debt for the illegal marijuana venture could not satisfy § 1958's pecuniary value requirement because the debt repayment was not legally enforceable, and Suiaunoa received no economic benefit because he had already spent the money. The district court rejected that argument, reasoning that "[y]ou would never be able to prosecute murder for hire cases if every contract had to be in writing," and that having a loan forgiven was an economic advantage.

The jury returned a guilty verdict, and the district court sentenced Phillips to 90 months in prison.

## II.  STANDARD OF REVIEW

We review de novo whether sufficient evidence supports a conviction. *United States v. Liew*, 856 F.3d 585, 596 (9th Cir. 2017). There is sufficient evidence if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*; *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

## III.    DISCUSSION

The federal murder-for-hire statute, 18 U.S.C. § 1958, provides in relevant part:

> Whoever . . . uses or causes another . . . to use . . . any facility of interstate . . . commerce, with intent that a murder be committed in violation of the laws of any State or the United States *as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value*, or who conspires to do so, shall be fined under this title or imprisoned . . . .

18 U.S.C. § 1958(a) (emphasis added).  The statute defines "anything of pecuniary value" as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage."  *Id.* § 1958(b)(1).

In *United States v. Ritter*, we explained that "[t]he intent to pay someone to commit murder is . . . a critical element of 'murder-for-hire.'"  989 F.2d 318, 321 (9th Cir. 1993).  In *Ritter*, the government failed to prove that the defendant, who was given $70 to build a pipe bomb, was also paid to commit murder or knew that his co-conspirator agreed to be paid for murder.  *Id.* at 321–22.

Thus, § 1958's pecuniary value requirement means that murder out of revenge or by a jilted lover does not constitute murder-for-hire.  Nor does a defendant's murder of his wife's ex-husband, in expectation that his wife would receive benefits from the ex-husband's life insurance, satisfy the requirement.  *See United States v. Wicklund*, 114 F.3d 151, 153–55 (10th Cir. 1997).

In *United States v. Chong*, we "specifically interpreted the language of § 1958's pecuniary value requirement," and held that "there must be evidence that the hitmen clearly understood they would receive something of pecuniary value in exchange for performing the solicited murderous act." 419 F.3d 1076, 1082 (9th Cir. 2005). In *Chong*, "the evidence show[ed] only that [the defendant's co-conspirator] volunteered for a dangerous assignment and wound up getting some walking-around money in the course of traveling to Boston," where he then learned about the plan to kill the victim. *Id.* at 1083. Because the jury did not have sufficient evidence that the co-conspirator knew he would receive any compensation specifically for the murder, we reversed the defendant's conviction. *Id.* at 1083–84.

However, we have not addressed the precise argument that Phillips raises here. Phillips does not dispute that, viewing the evidence in the light most favorable to the prosecution, he and Suiaunoa clearly and specifically agreed to loan forgiveness in exchange for Fruchter's murder. Rather, Phillips argues that an unenforceable debt cannot satisfy the pecuniary value requirement of § 1958. He points to the fact that the $30,000 loan was for an illegal venture, so it could not be legally enforced, and—in any event—Suiaunoa lacked any assets with which to pay him back. According to Phillips, this means that forgiving the loan was of no economic benefit to Suiaunoa, and it had only the non-pecuniary benefit of preserving Suiaunoa's "street credibility."

Congress did not write § 1958 so narrowly—the language sweeps in "anything of value" of which "the primary significance . . . is economic advantage." 18 U.S.C. § 1958(b)(1). This broadly applies to currency, drugs, weapons, or anything else that has a quantifiable monetary

value. *See United States v. Gibson*, 530 F.3d 606, 609–11 (7th Cir. 2008) (concluding that the district court properly instructed the jury that "not only money, but also drugs, guns, or involvement in future crimes which would yield cash profits, can also constitute consideration" under § 1958); *United States v. Washington*, 318 F.3d 845, 854 (8th Cir. 2003) ("Payment of this amount of heroin . . . is sufficient to meet the requirements of Section 1958(b) . . . ."). The words "as consideration for" do not strictly import contract law, but instead require a clear mutual agreement between the solicitor and hitman of payment in exchange for murder. *See Chong*, 419 F.3d at 1081–82. Therefore, the plain meaning of § 1958 unambiguously encompasses a quid pro quo understanding involving something of economic value, as understood by common sense.

Thus, despite Phillips' contention, the pecuniary value requirement does not require the murder-for-hire agreement to comport with contract rules, as Congress did not aim § 1958 only at murderous businessmen. After all, debt enforcement is the sine qua non of the criminal underworld. While there may be no honor among thieves, there are certainly obligations—as Don Corleone, on the day of his daughter's wedding, made clear to Amerigo Bonasera. It is enough that Suiaunoa received money from Phillips and felt obligated to pay him back. Phillips' promise to relieve Suiaunoa of this debt, in return for Fruchter's murder, gave Suiaunoa an economic benefit, satisfying the pecuniary value requirement of murder-for-hire.

In so holding, we join our sister circuits' understanding that § 1958 does not require that the promised economic advantage be enforceable. In *United States v. Hernandez*, the Eleventh Circuit concluded that "contract-based rules . . .

do not fit well in the § 1958 context." 141 F.3d 1042, 1057 (11th Cir. 1998). The Eleventh Circuit further reasoned that "[a]n agreement to commit a crime is unenforceable, so it is ridiculous to speak of enforceable, binding contracts to commit crimes." *Id.* "By specifying the conditions under which agreements are enforceable, the law of contracts regularizes and encourages business transactions, which is the last thing Congress would have wanted to do with criminal transactions." *Id.*

Similarly, the Fifth Circuit in *United States v. McCullough* rejected the hitmen-defendants' argument that there was no promise to pay because the signed financing statement from their solicitor was a "scam[]"—that is, it was uncollectable, rendering the statement itself "utterly valueless and useless." 631 F.3d 783, 792 (5th Cir. 2011). The Fifth Circuit explained that, even if the defendants could not use the statement to collect funds from a bank directly, there was sufficient evidence that the document "represented [the solicitor's] legitimate promise" to pay the hitmen after the murder. *Id.* at 792–93.

The Seventh Circuit also has repeatedly explained that § 1958 does not require anything more than a quid pro quo exchange of something of economic value for murder. *See, e.g.*, *United States v. Caguana*, 884 F.3d 681, 688 (7th Cir. 2018) (rejecting the defendant's argument "that under the Uniform Commercial Code, any promise he made did not amount to legally binding consideration"); *Gibson*, 530 F.3d at 610 (stating that "the use of the word 'consideration' does not import all of contract law, it should be interpreted in accordance with its plain meaning, which is 'in return for' or 'in exchange for'" (internal quotation marks and citation omitted)).

Accordingly, Phillips' promise of loan forgiveness satisfied § 1958's pecuniary value requirement.

**AFFIRMED**.